UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

PEI CHUANG, : CA NO. 16-915-RGA
:
Plaintiff, :
:
v. : February 14, 2017
:
OD EXPENSE LLC, et al., :
:
Defendants, : 2:01 O'clock p.m.
..............................:

TRANSCRIPT OF MOTION TO COMPEL ARBITRATION AND STAY

BEFORE THE HONORABLE RICHARD G. ANDREWS

UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiff: ASHBY & GEDDES
BY: ANDREW D. CORDO, ESQ
-and-

BUSHELL, SOVAK, OZER & GULMI
BY: CEM OZER, ESQ

For Defendants: COLE, SCHOTZ, MEISEL, FORMAN & LEONARD P.A.
BY: NICHOLAS J. BRANNICK, ESQ
-and-
SHEPPARD, MULLIN, RICHTER & HAMPTON
BY: MARK E. MCGRATH, ESQ

Court Reporter: LEONARD A. DIBBS
Official Court Reporter

P R O C E E D I N G S

(The proceedings occurred at 2:01 o'clock p.m. as follows:)

:01:19 THE COURT: All right.

Good afternoon and please be seated.

This is Pei Chuang v. OD Expense LLC, et al., Civil Action No. 16-915.

Could we have the appearances for plaintiff?

:01:37 MR. CORDO: Good afternoon, your Honor.

May it please the Court, Andrew Cordo from Ashby & Geddes for the plaintiff.

I'm joined by my co-counsel, Cem Ozer, who has been admitted pro hac.

:01:48 THE COURT: All right.

Thank you.

MR. BRANNICK: Good afternoon, your Honor.

Nicholas Brannick from Cole Schotz on behalf of the defendants.

:01:58 With me today is Mark McGrath of Sheppard Mullin, who has been admitted pro hac, and with the Court's permission, will present the argument.

THE COURT: All right.

And, so, it is the defendants' motion, so Mr. McGrath?

:02:15 MR. MCGRATH: Good afternoon, your Honor.

THE COURT: And Sheppard Mullin, when I was young that was in Los Angeles.

Where are you from?

MR. MCGRATH: I'm from New York.

:02:26 But, your Honor is correct, that's originally where the firm was founded. I believe this year is our 90th anniversary.

THE COURT: All right.

I was just trying to make sure that you didn't have to come across country for this.

:02:39 Okay. Go ahead.

MR. MCGRATH: Your Honor, the defendants here moved to compel arbitration.

On October 10th, 2013, the plaintiff, Mr. Chuang, executed two agreements.

:02:53 One, a Supply Consulting Services Agreement, which we refer to as the Supply Agreement, which is attached as Exhibit D to plaintiff's Complaint.

That agreement provides that the plaintiff is retaining Regeneration Shanghai to provide investment consulting services :03:13 for purposes of conducting due diligence on potential investments in China's business.

In exchange for those services, the plaintiff agreed to pay $1,822,737 in total, which equated to approximately 298,000 U.S. dollars.

:03:39 The plaintiff wired that money within China

Regeneration Shanghai's bank account in China. And while not relevant for purposes of this motion, all that money was, in fact, used to pay attorneys and accountants for due diligence services relating to a potential IPO of the company known as Oriental Dragon.

That agreement in Section 19 contains a dispute resolution provision, which requires the parties to negotiate in good faith. If they can't reach an agreement to resolve their disputes, they agree to arbitrate before CIETAC, C-I-E-T-A-C, which is the China International Economic & Trade Arbitration Commission, Shanghai's sub-commission.

That's relevant. The plaintiff is a resident of China. And, so, therefore, it is convenient for the plaintiff to arbitrate his disputes there.

THE COURT: Is there anything about that language in Section 19 that makes this a mandatory procedure?

(Pause)

MR. MCGRATH: Your Honor, if you look at 19, it says, "If any dispute arises" -- and I'm just going to skip some language -- "both parties shall within -- " a certain amount of time -- "negotiate in good faith. If both parties fail to settle the dispute through such negotiation, either party may submit the dispute to CIETAC."

THE COURT: So, you know, that does say "shall," but the part about submitting to CIETAC says "may," right?

MR. MCGRATH: You're correct, your Honor.

THE COURT: Isn't "may" generally not a mandatory sort of thing?

MR. MCGRATH: In general parlance, I would agree with your Honor.

:05:44

But what this is called -- the provision is entitled "dispute resolution," and it specifies a two-step process, which is, first, to negotiate in good faith. And, as your Honor pointed out, they may submit it to CIETAC for arbitration.

:06:00

And then it says, "arbitration shall be held before three arbitrators, two of which" --

THE COURT: Right. I read the rest of it.

If they go that route, it says what it is.

MR. MCGRATH: And the last sentence says, "Arbitration award shall be final and binding upon both parties."

:06:14

So I think when you look in the context of the provision, the context suggests, and the language there, it should be mandatory on the parties to that agreement.

THE COURT: And the parties to this agreement are the plaintiff and whom?

:06:34

MR. MCGRATH: Regeneration Shanghai.

THE COURT: Which is not in this lawsuit, right?

MR. MCGRATH: It is not a named defendant. The plaintiff chose not to name that Regeneration Shanghai.

:06:53

THE COURT: Well, if plaintiff had chosen to name

Regeneration Shanghai, I'm just curious, what would have given me jurisdiction over a Chinese company who has a business in Shanghai?

MR. MCGRATH: In terms of personal jurisdiction?

:07:09 THE COURT: Yeah.

MR. MCGRATH: I don't believe there would have been any basis for your Honor to exercise personal jurisdiction over Regeneration Shanghai. And that might be one of the reasons why the plaintiff chose to omit them as a defendant in this case.

:07:23 But the other defendants here have sought to compel arbitration under that provision, under an incorporation by reference standard, or an agency standard.

THE COURT: What is an incorporation by reference standard?

:07:38 MR. MCGRATH: The case law was clear that a non-party to an agreement that requires arbitration can compel arbitration of a signatory if it is incorporated by reference into a document.

And if you look at the Class B Membership Interests :07:56 Subscription Agreement, which is Exhibit C to the Complaint, the second whereas clause specifically says, "whereas the subscriber" -- that's the plaintiff -- "has entered into a Consulting Agreement to supply Consulting Services Agreement with Regeneration Capital Group, Shanghai Office, for due :08:15 diligence and other financial consulting services.

And then the next clause says, "whereas the company desires to issue to the subscriber, the subscriber desires to subscribe to and accept from the company, a Class C Membership Interest in the company, which is OD Expense LLC.

:08:31 THE COURT: And, so, the whereases, which aren't actually part of the agreement, are they, the agreement starts really below the whereases, doesn't it?

MR. MCGRATH: The parties agree, yes, but the agreement incorporates those whereas clauses.

:08:52 And if you look at paragraph --

THE COURT: And you say the whereas clauses incorporate the Supplier Agreement?

MR. MCGRATH: It makes specific reference to that agreement.

:09:06 If you look at Paragraph 4, it specifically talks about what the -- what the effect of the two -- the equivalent of the 298,000 shall be in terms of the plaintiff's investment in OD Expense.

THE COURT: So your incorporation by reference :09:26 argument, is it because the plaintiff entered into an agreement with -- let's just call them Shanghai -- and because that agreement is mentioned in connection with a different agreement where it's described, that that makes the parties to the different agreement able to assert arbitration, or the :09:59 equivalent of arbitration, a procedure that is in the Supplier

Agreement for that agreement? That's your argument?

MR. MCGRATH: Well, yes, your Honor.

If I might rephrase?

It allows the defendants that were named in this case to require the plaintiff to comply with this contractual obligation to arbitrate before CIETAC.

And then the other argument that we made is that the signatory to the Supply Agreement, Mr. Kaufmann, who's named as a defendant here was active. You can see Mr. Richard Kaufman, for and on behalf of Regeneration Capital Group, Shanghai. He's a named defendant in this action as well.

THE COURT: And the other defendants, which --

MR. MCGRATH: OD Expense and Altbachco, LLC.

THE COURT: Plus the Shanghai New York, how do they get to demand arbitration?

MR. MCGRATH: Well, in terms of -- Regeneration New York, which we'll use, isn't a party to any of these agreements nor is Altbachco, nor is Mr. Kaufman, except as a signatory.

The plaintiff's named them in an effort to get around the agreements, which he signed, which specifically state he was going to cobble -- or according to them -- he cobbled together $398,000 to purchase due diligence services which were to obtain a Class B Membership Interest OD Expense.

So these parties, the only agreements, you know, are the Supply Agreement and the Membership Interest Agreement. Mr.

Kaufman signed both of them.

THE COURT: He did.

MR. MCGRATH: Well, he signed --

THE COURT: One of them he signed as a managing member.

:12:12 MR. MCGRATH: Yes.

THE COURT: And, so, your argument is that people who are not party to either one of these agreements can have their disputes with the plaintiff set in arbitration?

MR. MCGRATH: As the non-signatory under the law, there :12:36 are certain different allowances or arguments that can be made, or a basis that non-signatories have to other --

THE COURT: So tell me one of them.

MR. MCGRATH: One would be agency.

THE COURT: Explain that to me.

:12:50 MR. MCGRATH: So Mr. Kaufman is a member of OD Expense. As plaintiff alleges in its Complaint, the members of OD Expense Regeneration New York -- to use the term -- and that company, as well as Altbachco and Mr. Kaufman, those are the Class A members of OD Expense. Those are the defendants here other than OD :13:21 Expense.

THE COURT: Well, how does that make Mr. Kaufman the agent of either Altbachco or Regeneration?

MR. MCGRATH: He was a member of Altbachco and Mr. Kaufman are the members of Regeneration.

:13:36 THE COURT: Well, you said that Mr. Kaufman is a member

of Altbachco.

MR. MCGRATH: No, he's not a member of Altbachco. He's a member of Regeneration New York.

THE COURT: So how does Altbachco become -- how does he become involved there then?

MR. MCGRATH: Altbachco is a member of Regeneration New York, which is also a member of OD Expense.

THE COURT: All right.

But if you and I and the plaintiff's attorneys are all members of some other entity, that doesn't make us each others agents?

MR. MCGRATH: That's correct.

Just because we're all members of an LLC, doesn't make us agents of one another, but what is alleged here is that defendants here in regard to the interest in OD Expense, purportedly defrauded the plaintiff in making certain statements. That's what the plaintiffs allege.

And what the defendants here are saying is that plaintiff specifically agreed to -- to arbitration in two separate agreements. And the defendants, either by virtue of incorporation by reference, or first, the explicit terms, second, incorporation by reference, or third, agency, wants the plaintiff to be compelled to do what he agreed to do, which is to arbitrate these disputes.

THE COURT: And, so, besides for agency, do you have

any others that you are advancing as to why an agreement between the plaintiff and either -- either of the two agreements, C or D, why that applies to nonparties to those agreements?

MR. MCGRATH: Well, all of the defendants are parties to the Operating Agreement, which is Exhibit C.

OD Expense is the entity. Regeneration New York is a member, Altbachco is a member, and Mr. Kaufman's a member.

And Exhibit C says that any disputes between the members shall be in arbitration before the AAA, under the Supply Agreement, which is between the plaintiff and Regeneration Shanghai. As we've already discussed, there's the two-step dispute resolution process.

And for that agreement we're saying, if you don't believe the AAA is appropriate here for the $298,000, or the equivalent of $298,000 that went to Shanghai, for that dispute, that should be arbitrated before CIETAC.

THE COURT: In the Shanghai Supplier Agreement, it's incorporated by reference into the Subscription Agreement. Does that mean that whatever dispute resolution applies to the Subscription Agreement and sweep in the resolution of the Supplier Agreement?

MR. MCGRATH: If -- if I understand your Honor correctly, you're asking me whether the incorporation by reference into the Subscription Agreement, that provision can then trump essentially the Supply Agreement?

Is that the question?

THE COURT: Well, I'm not saying necessarily overruled. What I'm just saying is, or asking is, Subscription Agreement incorporates another agreement by reference, and their Subscription Agreement has certain dispute resolution procedures, can they apply to, for example, the entire $398,000, which is after all discussed, mentioned by a particular name on Page 3 of the Subscription Agreement, right?

MR. MCGRATH: Yes, it's at the bottom in Schedule 1 on the Subscription Agreement.

THE COURT: Right. So the Subscription Agreement relates to the $398,000. And we assume the Operating Agreement is part of the Subscription Agreement, and the Operating Agreement has a procedure for resolving matters relating to the Subscription Agreement.

Isn't the entire $398,000 a matter relating to the Subscription Agreement?

MR. MCGRATH: It could be, your Honor, in some circumstances.

What it says, as I think your Honor is pointing out is, Paragraph 4 says that the amounts paid pursuant to the Supply Agreement will be credited towards the plaintiff's purchase price under this agreement. So they are crediting the amount paid under the Supply Agreement to allow the plaintiff to get the $398,000.

:19:26 :19:44 :19:58 :20:04 :20:30

But the plaintiff brought two separate things.

He brought due diligence services under the Supply Agreement for the equivalent of 298,000. That money was then credited towards a total investment of $398,000 in the OD Expense, so there was 100,000 paid to OD Expense.

And for purposes of calculating the amount of shares that the plaintiff would be entitled to, if there was an IPO of Oriental Dragon, the plaintiff would have received the credit of the combined two amounts.

THE COURT: All right.

Let's just talk about the arbitration and the Operating Agreement for a minute.

MR. MCGRATH: Sure.

THE COURT: So you got Section 11.10, right? Do you have that in front of you?

MR. MCGRATH: Yes, your Honor.

THE COURT: And it says, "Except as otherwise provided in this Agreement, any dispute arising out of this Agreement shall be submitted to the American Arbitration Association for resolution."

The introductory clause there, "except as otherwise provided in this agreement," what does that refer to?

MR. MCGRATH: Your Honor, I'm -- I did not draft it.

I think what it's referring to is that there's a provision 11.8 that allows the parties to come to Delaware.

:20:50 :21:07 :21:26 :21:43 :22:04

And the way I interpret the Section 11.10 is that any disputes arising out this agreement shall be submitted to the AAA, except as otherwise provided in this agreement.

There there's no other explicit provision that states what the parties shall do.

Section 11.8 says, each member agrees to submit to the exclusive jurisdiction of the courts -- I'm going to paraphrase -- of the Delaware Courts in any action arising out of any dispute relating to this agreement.

So the parties agreed to submit to the jurisdiction of this court and State Courts in Delaware, and it provides for is service of process.

So, as your Honor is aware, typically, you've got an arbitration. If the parties -- if the loser in that arbitration doesn't pay, you'll have a Motion to Vacate or Confirm, and appeals related to that arbitration.

THE COURT: So you would have to say that if that's what the contract was designed to accomplish, it's pretty badly written to accomplish that, isn't it?

MR. MCGRATH: I would like to think I would do better, your Honor, yes.

THE COURT: Other than Section 11.8, you can't suggest anything else that Section 11.10 can be referring to when it says, "Except as otherwise provided in this Agreement"?

MR. MCGRATH: That's correct, your Honor.

And I don't see any provision there. I haven't seen anything where they provided for another remedy to apply, other than 11 point.

THE COURT: And you would have to say, wouldn't you, that it's kind of an odd thing to say, which is... sorry.

All right.

Is there any time limit involved in submitting something to the New York Arbitration Association?

MR. MCGRATH: In terms of the Statute of Limitations?

THE COURT: Right.

In other words, the contract was signed in 2013, and I guess the money was paid soon thereafter -- at least some of the money was -- is there -- if I compelled arbitration in New York, is there any, so to speak, technical defense that you would be asserting in New York?

MR. MCGRATH: No, your Honor. The defendants wouldn't be asserting any Statute of Limitations defense or any sort of technical defense to prevent an arbitration of this matter.

THE COURT: And because you represent -- you represent all four of the defendants, right?

MR. MCGRATH: That's correct, your Honor.

THE COURT: And, so, all four of the defendants agree that if I were to compel arbitration in New York, that the New York -- that the American Arbitration Association has, so to speak, jurisdiction over them?

MR. MCGRATH: Yes. I mean, is your Honor asking because Altbachco and Richard Kaufman aren't parties to the agreements, would they object to jurisdiction? Is that --

THE COURT: Well, I mean, I'm partly -- I'm asking just because it's all very -- it's probably not the right word -- but amorphous as to what might happen later on.

I kind of remember part of the argument by the plaintiff was there should be a lot of keeping options open as to what defenses might be asserted down the road, but it may be the case that talking in terms of contracts, I shouldn't concern myself too much about where the chips may fall.

Certainly, I have impression that the plaintiffs are suspicious of a double-cross going on here.

MR. MCGRATH: Your Honor, if I may?

I understand because this is the plaintiffs. You read the plaintiff's Complaint and you read their statement of facts.

We intentionally did not get into the merits of this dispute. That's not the purpose of a Motion to Compel Arbitration.

I will tell you, your Honor, that the story is, and what the plaintiffs will tell you, I've seen in e-mails that the plaintiff who's supposedly naive, but if you buy the plaintiff, within weeks of executing this agreement was passing on comments such as, I recently saw the IPOs of -- naming two companies -- I guess they haven't impacted the market very much.

Now, that's -- I'm 45 years old. The plaintiff here is alleged to be a student. I don't write e-mails to people talking about IPOs and their effect on the markets.

Even though I invest my money, it doesn't seem like this person who came up with $398,000, which is a lot of money, is necessarily a naive person, especially when you look at these agreements. And the Supply Agreement and the Consulting Agreement are written in both English and Chinese as first and second languages, tells you exactly what he was doing.

But I think if your Honor just circled back to the question, your Honor's wondering if there some sort of trickery that's going to happen here.

No, the defendants here will go into arbitration, and they'll put forward their defense similar to what I've just mentioned, that the plaintiff is not this naive student. Is, in fact, a PE or Venture Capital Associate at a bank in China. He's sophisticated. He knows exactly what he's doing. The e-mails will back that up in his communication, which were written in very good English to the -- to my clients, which I've seen them.

We'll put forward a defense, and the arbitrators will ultimately decide was the plaintiff defrauded as they allege, or they did enter into agreements eyes wide open, and understanding exactly what the agreements say they say that he was purchasing; namely a Class C interest.

And in Section 6.6 of the Operating Agreement it tells you, if there is a public offering of Oriental Dragon, there's are places how they are going to guilty their. It tells us you exactly what he's buying.

:27:50 I mentioned, there will be no chicanery or trickery here in terms of putting forth a defense.

THE COURT: All right.

Is there anything else you want to say, otherwise, I will hear from your opponent?

:28:08 MR. MCGRATH: Not at this time.

THE COURT: All right.

Let me hear from Mr. McGrath.

You're Mr. McGrath.

Let me hear from Mr. Ozer.

:28:22 MR. OZER: Thank you, your Honor.

Good afternoon, your Honor.

THE COURT: Good afternoon.

MR. OZER: Cem Ozer for the plaintiff, Pei Chuang.

I'm glad that the defendants aren't going through :28:41 trickery or chicanery, because the Complaint is replete with a lot of chicanery that is going on with respect to my client, Pei Chuang.

Right now with the Motion to Compel, and the standard that defendants have espoused on the Federal Rule of Civil :29:01 Procedure 12(b)(6), the facts that are pled are what is before

this Court, not whatever defendants thinks they are.

To that end, unlike --

THE COURT: So Rule 12(b)(6), how does that play into what I'm supposed to be doing here?

:29:23 MR. OZER: Well, you're supposed to be, your Honor, looking at the facts pled. The documents that are -- you can get to the documents that are attached that are incorporated into Complaint.

When you look at those, those do not support the :29:39 defendants' position.

THE COURT: And the defendants' position right now is just arbitration is required, right?

MR. OZER: Arbitration is required, yes. Arbitration in China and arbitration in the United States.

:29:50 THE COURT: And how much do the Complaint, because I did look at it a while ago, these various facts, how do they relate to anything as opposed to me just looking at these two or three contracts?

MR. OZER: Well -- I'm sorry -- how did --

:30:09 THE COURT: So, if I assume all the facts in the claims are most favorable to the plaintiff are true, do I reach some different conclusion if I just look at the two contracts?

MR. OZER: Well, you do in the sense -- well, you do in the sense that you're looking at fraud allegations, all of which :30:36 occurred -- all occurred in New York.

THE COURT: Yes.

MR. OZER: So I don't understand where the China aspect of this fits in. There's nothing in the Complaint that really supports it.

:30:49 The defendants go at length about how the Supply Agreement, which was entered into between my client and a non-party, is controlling when it is not.

So, if you look at the Complaint, it's very peripheral actually to what happened in this case.

:31:08 My client met with defendant, Richard Kaufman, and it was based on Richard Kaufman's representations, fraudulent representations that my client was out nearly $400,000.

Now, if we go to the Supply Agreement, the Supply Agreement talks about a permissive standard of arbitration, not :31:35 a shall arbitrate. And it's a meeting between just Mr. Frank and Shanghai Regeneration, which is not, again, not a party.

Now --

THE COURT: And Shanghai Regeneration, the entity that signed the Supply Agreement, are they actually mentioned in the :31:47 Complaint?

MR. OZER: Well, we do make a reference to that.

THE COURT: And what is it that you say about that?

MR. OZER: That they entered into that agreement. And then -- and that no services were received ever from Shanghai :32:13 Lee generation.

THE COURT: But there is no further allegations by you as to what the connections -- is there something in the Complaint that says what the connection between Shanghai Regeneration, and the group of, let's call them crooks in New York?

:32:33

MR. OZER: Well, the only allegation we made is, upon information and belief that I think Shanghai Regeneration might be affiliated with Regeneration, but honestly we don't know.

And interestingly here, the people who would know, the defendants, make this motion and say, since it's China, but they don't explain what that relationship is. I mean, their people would know, we wouldn't, as to what the relationship is between Regeneration Shanghai and the gang in New York.

:32:49

Interestingly, Mr. Kaufman did sign the Supply Agreement, but then he doesn't list what his title is, what his connection is with --

:33:14

THE COURT: Doesn't he say, "on behalf of"?

MR. OZER: He says, "on behalf of".

I guess a good word would be cagey as to what everybody's relationship is to one another.

:33:29

But at the end of day it's not about what happened, or did not happen in China. It's about the representations that were made in New York by the defendants that were named.

Now, having done away with the Supply Agreement, we turn our attention to the Subscription Agreement.

:33:51

The Subscription Agreement really does not incorporate by reference the Supply Agreement. It mentions it, but it really doesn't incorporate it such that any arbitration provision that would be in the Supply Agreement would then control the parties to the Subscription Agreement.

:34:07

THE COURT: I have to admit that most of the time when I see something that's incorporated by reference, you can tell me that those three magic words, "incorporated by reference."

They are not, I don't believe, present.

:34:21

MR. OZER: Exactly, your Honor. They are missing from this -- from the Subscription Agreement.

And to the extent, though, defendants cited case law for their argument, at least cited to -- it's a Standard Bent Glass Corporation, and I believe Tyco, the other case that they referenced.

:34:44

In those cases -- those cases are very dissimilar and distinguishable from what we have here. In those cases, the arbitration provisions that were incorporated applied to the parties that were really in the dispute, the actual litigants in dispute where one could say, we entered into the project. And if you look at Appendix 8, which we incorporate by reference into our contract, it has those words, we will arbitrate any of these disputes.

:35:00

It's very different from this case.

At best, the Supply Agreement is talking about a

:35:14

permissive arbitration that may or may not occur between Mr. Chuang and a non-party.

And it doesn't even talk about who the affiliates, parents, et cetera are, or that is non-partner.

:35:33 So putting aside the Supply Agreement, we turn now again to the Subscription Agreement. It's a fundamental premise of the FAA, Federal Arbitration Act, that somebody has to actually agree to arbitrate.

And we don't have that here. That's Step 1.

:35:53 THE COURT: Can you explain that, please?

MR. OZER: Well, the case law says is, that there should be an expressed unequivocal agreement before a court can order a party to arbitrate.

And we look at the provisions of the Operating Agreement, :36:10 which goes with the Subscription Agreement, and we're looking at the two clauses.

First, I'll go to Section 11.10 of the Operating Agreement, which starts out with the clause, "Except as otherwise provided in this Agreement" -- any dispute -- and I'll :36:28 paraphrase, shall be submitted to the American Arbitration Association for a solution.

Well, that's the thing, "Except as otherwise provided in this Agreement."

So then we have to go back up to Section 11.8 :36:42 jurisdiction and venue, which expressly provides that each

member consents to the exclusive jurisdiction of the Federal and State Courts located in Delaware in any action arising out of a dispute under or in connection with this Agreement.

:37:08 So, at this point, the language seems to be clear that there's a distinct carve-out in the subscription -- oh, I'm sorry -- yeah, in the subscription -- in the Operating Agreement, which is incorporated in the Subscription Agreement, that says there can be Court action.

:37:30 Because arbitration is really at the end of the day a progeny of contract law. If the party hasn't agreed to arbitrate, it can't be compelled to do so by the Court. And any presumptions, or favor in the law as to arbitration, really go to the issue of whether something is arbitrable or not, not whether somebody has actually agreed to an arbitration or not, which is really where we're at. :37:52

THE COURT: So you agree with your opponent that Section 11.10, "Except as otherwise provided in this Agreement" language, has to be interpreted to be referred to Section 11.8, the jurisdiction and venue?

:38:15 MR. OZER: Your Honor, I think -- honestly, I think it would be, but I'm not sure that's all it's limited to.

THE COURT: What else is there?

MR. OZER: Honestly, your Honor, I do not know. I'm not the one who drafted this agreement. My client was not -- did not negotiate this agreement. It was presented to him sort :38:32

of as a fait accompli.

So I'm not sure I can answer that, but I'm not sure the plaintiff can, and he knows that question.

THE COURT: The plaintiff gave me an answer, and you may agree or disagree, but did he give me an answer.

You're saying you don't even want to give me an answer?

MR. OZER: Well, I think it includes 11.8, but there's an exception there. There's a clear exception, that he did not agree to everything except as to arbitration.

THE COURT: And, so, why does it make sense what the defendant has argued, which is that, you know, you've got Section 11.10. It certainly seems to suggest mandatory arbitration for anything -- any dispute arising out of the agreement, you know, quote, "Except as otherwise provided in this Agreement."

And the "otherwise provided in this Agreement" referring to Section 11.8, which fits in arguably, nicely as where you would force or vacate an arbitration award, because you're okay for the arbitrator to vacate or give them an arbitrator award.

MR. OZER: Well, your Honor, as your Honor put it, if they wanted to say that, they could have written that. And I've seen plenty of agreements that actually say that.

THE COURT: Well, that's an answer.

Is there anything else about these two sections that

you think supports your position?

MR. OZER: I think that will be it, your Honor.

THE COURT: All right.

So, the way your Complaint is drafted, are you alleging that these defendants are basically in a conspiracy, which makes them the agent of each other?

MR. OZER: Well, if they were acting as an agent of the other one, yes.

THE COURT: And, so, the -- if I disagree with you about whether or not the Subscription Agreement has a mandatory arbitration, does that mean that all the defendants go to arbitration?

MR. OZER: Well, if you could -- if you -- if you order us to go to arbitration or compel arbitration, I would have to say that all defendants would -- the named defendants would go to arbitration, yes.

THE COURT: Okay.

And, so, is it your understanding that what plaintiff -- I'm sorry, you're the plaintiff -- what defendants are asking for here is for me to enter an order that says, you know, you all have to follow some other dispute resolution procedures. This case is stayed. And when you finish those other things, if somebody needs some enforcement, or something else, you can come back to me?

MR. OZER: I think that's what they may be arguing.

THE COURT: In other words, if I agree that there's some arbitrable subject matter here, is that what you would want me to do is, order arbitration, but stay the case pending the results of the arbitration?

:42:38 MR. OZER: Well, I would remind you to order arbitration.

THE COURT: Well, no, no, I understand that. Assume that.

MR. OZER: If I'm assuming you are going to order

:42:47 arbitration, would I want -- well, arbitration is -- well, they've asked for a stay, so I'm not going to ask for -- I'm not cross-moving, if that's what you're asking, your Honor.

It's their motion, so I'm not -- I'm just looking for a denial of their motion.

:43:06 THE COURT: Okay. All right.

Do you have any other argument?

MR. OZER: No, I think I'm done.

THE COURT: All right.

Well, thank you, Mr. Ozer.

:43:19 MR. OZER: Thank you, your Honor.

THE COURT: All right.

Mr. McGrath, do you have anything that you want to say in response, or I guess reply?

MR. MCGRATH: Very limited, your Honor.

:43:29 I think the plaintiff advanced an argument that there

were no cases that dealt with those particular sort of facts here. And I would refer your Honor to the Aluminium Bahrain case. It deals with a -- it's 17 F.Supp. 3d 461. It's a 2014 case out of the Western District of Pennsylvania, which obviously isn't binding on your Honor.

THE COURT: Well, I actually -- I have it here. I have looked at it.

MR. MCGRATH: Okay. Because it talks about the equitable estoppel issues, and the plaintiff seeking to have his cake and eat it, too.

And what the plaintiff here is seeking to do is to claim fraud for the defendants relating to $398,000, which matches up exactly to what the agreements are here.

And, so, what he's trying to do is avoid the dispute resolution provisions yet sue basically on the agreement saying, even though they said -- they say what they are, and what you're getting is a Class C investment --what he really said is, I'm getting shares in Oriental Dragon.

So I think this case is similar to that case in that the plaintiff is trying to have his cake and eat it, too.

One thing --

THE COURT: And let me just ask two questions here.

The equitable estoppel argument that was mentioned in this Western District of Pennsylvania case, as you just said, is essentially, I guess, what equity is.

It's kind of a common sense thing, which is plaintiff suing over $398,000, where there's an agreement saying, disputes arising out of the payment of $398,000 go to arbitration?

MR. MCGRATH: Right.

:45:29 THE COURT: And, so, you know, you can split hairs here and there, but if you look at it sort of practically, this is like in the center of what would be arbitrated.

MR. MCGRATH: Yes, your Honor, and it's all discussed, as your Honor points out in that equitable estoppel provision. :45:53 And it says a non on page 469 to 470, estoppel combined non-signatory to an arbitration falls when that non-signatory has reaped the benefits of the contract containing an arbitration clause.

Here, I don't think there's any dispute that the :46:10 plaintiff or others wired the equivalence of 298,000 to Regeneration Shanghai.

What -- what hasn't come out here, and will come out, is that the reason that the plaintiff did that is because the plaintiff couldn't ex-patriot that money out of China because of :46:30 the Chinese law. He couldn't bring that money to the United States to invest in OD Expense.

The reason he did it was to put him in the Regeneration Shanghai to pay for due diligence, for the costs associated in China, which is an OD Expense. The Class C Interest was to :46:47 invest in a Chinese company. So it all matches up as to what

the purpose of their money was.

THE COURT: So let me just -- - so the second question that I wanted to ask you is, as a practical matter, as a -- trying to keep the cost of litigation kind of -- trying to keep the cost of litigation to a minimum.

:47:34

The best solution here would be to defer this to compel arbitration with the American Arbitration Association for the entire $400,000, right?

MR. MCGRATH: I presume so, your Honor.

:47:56

I can't speak for the plaintiff who's a resident of China, so he's going to have to come over here and fly over here.

THE COURT: But he wants to do that, right?

MR. MCGRATH: Well --

:48:11

THE COURT: I mean, you're busy trying to say you can resolve most of this in Shanghai.

He's not buying that, right?

MR. MCGRATH: Well, I don't know what -- whether he's -- I know what arguments are being advanced on his behalf are. I don't know whether it is in his interest or not.

:48:24

THE COURT: Well, I assume that he and his attorney knows what's in his best interest.

So what I really, I guess -- but it's a fair question.

I'm asking from the point of view of your clients, the cheapest way to resolve this is to do it all in front of the

:48:39

arbitrator.

I'm saying that you're in New York, and Mr. Kaufman seems to be in New York doing something in front of the New York -- American Arbitration Association in New York.

:49:01 That would be the most expensive way to resolves this, right?

MR. MCGRATH: The only reason I hesitate, your Honor, is because my firm has an office in Shanghai as well, so we're equally capable of doing an arbitration there. And I don't know :49:18 what my colleagues in China charge for their service, but we're capable, Sheppard Mullin's capable of doing this arbitration either in New York or in Shanghai.

THE COURT: All right.

But I guess, regardless of that, one of the things that :49:36 doesn't make much sense is splitting it into two different arbitrations?

MR. MCGRATH: I can understand why your Honor posited that question.

THE COURT: Do you disagree with that?

:49:48 MR. MCGRATH: Just from a metaphysical standpoint, no, your Honor. To be honest, no.

THE COURT: Okay. Well, you know, we encourage honesty.

MR. MCGRATH: The only reason I hesitated is we do have :50:11 two separate agreements here. Obviously, there could be

:50:27 :50:42 :51:05 :51:19 :51:28

different purposes.

But I can understand if your Honor says, if you were to take this, and look at the Subscription Agreement, and say it's crediting at two hundred -- the equivalent of $298,000, so and you have 398,000, and I'm going to read it to be that they're together for purposes of the dispute, and, therefore, I think it should go to the AAA.

I think, under those circumstances, if your Honor read the agreement that way, yes.

THE COURT: Mr. Ozer says, because of this stage of this case in litigation, that I should be looking at things that are 12(b)(6) standards, which means to the extent that it's relevant to anything, that I take his Complaint as being true, right?

MR. MCGRATH: That's the 12(b)(6) standard, unless it's contradicted by document, evidentiary evidence, things referred to and --

THE COURT: Right, right, which there are only two relevant documents that we're talking about here, the two contracts.

MR. MCGRATH: That's correct, your Honor. That's what -- that's what we're talking about here.

Actually, the three agreements, but -- Exhibit C and D to the Complaint.

THE COURT: Right.

MR. MCGRATH: I think that is the running standard, but your Honor doesn't have to give credence to the plaintiff's interpretation of those.

Your Honor's job is to interpret those agreements as a matter of law, and decide whether they say what I say they say, or what the plaintiff's says they say.

THE COURT: Anything else?

MR. MCGRATH: No, your Honor.

THE COURT: All right.

Hold on just a minute.

(Pause)

All right.

Well, we'll take this under advisement. Hopefully, it will not take too long to resolve this, which we'll do in some sort of written fashion.

Unless there's anything else, thank you.

Are you from New York, too?

MR. OZER: Yes, I am.

THE COURT: Thank you both for coming down to do this argument. Nice to see you. And thank you Delaware counsel.

We'll be in recess.

MR. MCGRATH: Thank you, your Honor.

MR. OZER: Thank you, your Honor.

(The proceedings adjourned at 2:53 o'clock p.m.)

* * * * *